# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SAMUEL K. MILLER       *
                     *
    v.                  *          Civil No. CCB-10-243
                     *
LEONARD HAMM, ET AL.     *
                     *
                     *

******

## MEMORANDUM

Plaintiff Samuel K. Miller ("Miller") brought this action against current and former members of the Baltimore Police Department ("BPD") in their official and individual capacities[1] (collectively, "the BPD defendants") and members of the Baltimore City Law Department in their official and individual capacities[2] (collectively, "the Law Department defendants"). Miller alleges that he was subject to retaliation in violation of 42 U.S.C. § 1983 and Maryland's Declaration of Rights, Articles 24 and 40, for exercising his right to free speech; that his due process rights were violated because he was deprived of property and liberty interests without notice and an opportunity to be heard; and that he was abusively discharged. Now pending before this Court is the BPD defendants' motion to dismiss or, in the alternative, for summary

_____

[1] Defendant Leonard Hamm ("Former Commissioner Hamm") was the Commissioner of the BPD at the time of the events which provide the basis for this action. Although the Amended Complaint's caption states that Commissioner Hamm is sued only in his official capacity, the Amended Complaint states elsewhere that the Plaintiff sues Commissioner Hamm in both his official and individual capacities. (*See* Am. Compl. ¶ 3.) The BPD defendants construe this as a suit against Commissioner Hamm in his official capacity only. (Mem. Supp. Defs.' Mot. Dismiss or Alternative Summ. J. ("BPD Defs.' Mem.") at 22.) Miller does not contest this categorization. (*See generally* Pl.'s Mem. Supp. Opp'n to Defs.' Second Mot. Dismiss. ("Pl.'s Opp'n").) This Court, therefore, will treat this as a suit against Former Commissioner Hamm in his official capacity only. Defendant Frederick Bealefeld III ("Commissioner Bealefeld") is currently the Commissioner of the BPD and is sued in his official capacity. Lt. Carl H. Crenshaw ("Lt. Crenshaw"), Sgt. Thomas Poffenbarger ("Sgt. Poffenbarger"), and John/Jane Does are and at all relevant times were members of the BPD and have been sued in their official and individual capacities. (*Id.*)

[2] Defendant George Nilson ("City Solicitor Nilson" or "Nilson") at all relevant times was and remains the City Solicitor, the highest-ranking lawyer within the Baltimore City Law Department. (*Id.* at ¶¶ 3, 24.) Defendant Karen Stakem-Hornig ("Stakem-Hornig") was Chief of the Office of Legal Affairs, an office within the BPD run by the Baltimore City Law Department. (*Id.* at ¶¶ 23–24.) Defendant Patrick Sheridan ("Sheridan") was a lawyer within the Office of Legal Affairs. (*Id.* at ¶ 21.) The Law Department defendants have been sued in their individual and official capacities. (*Id.* at ¶ 3.)

judgment and the Law Department defendants' motion to dismiss. The issues have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons stated below, the motions will be granted in part and denied in part.

## BACKGROUND

Miller alleges the following facts.[3] In August 2001, the BPD hired Miller as a Flight Officer in its Aviation Unit. Miller had experience flying helicopters for law enforcement, and he joined the BPD based on the understanding that he would continue to fly helicopters. Between August 2001 and the Spring of 2006, he consistently received positive performance evaluations, particularly regarding his ability to work cooperatively with others, and the BPD awarded Miller the bronze star for valor in 2004. (Am. Compl. ¶¶ 6–8.)

In the spring or summer of 2006, BPD Colonel Michael Andrew ("Col. Andrew") was assigned to perform a review of the Aviation Unit. Miller drafted a letter, which he intended to deliver to Col. Andrew, critiquing many aspects of the Unit.[4] (*Id.* at ¶¶ 9–10.; BPD Defs.' Mem., Ex. 2, Miller's 16 May, 2006, Letter to Col. Andrew ("Miller Letter").) Miller wrote the letter on his own initiative, not pursuant to a superior's instructions, and he was under no obligation to

---

[3] The BPD defendants have moved to dismiss or, in the alternative, for summary judgment, and they have attached numerous exhibits to their motion to allow this conversion. As there has not been a sufficient opportunity for discovery, this motion will not be converted to one for summary judgment. (*See, e.g.*, Pl.'s Opp'n at 20, 30 (noting that the defendants did not provide a relevant performance review or personnel evaluation, and stating that discovery is necessary for their production).)

[4] The defendants attached a number of documents to their motions. The Fourth Circuit has held that a court may consider a document attached to a defendant's motion to dismiss without converting the motion to one for summary judgment if the document "was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal quotation marks, alterations, and citations omitted). Here, in his complaint, the plaintiff has explicitly relied on two documents attached to the defendants' motions: (1) Miller's letter to Col. Andrew (BPD Defs.' Mem., Ex. 2) and (2) a Notice of Personnel Action (BPD Defs.' Mem., Ex. 5; Defs.' Stakem Hornig, Nilson, & Sheridan Dem. Supp. Mot. Dismiss ("Law Dep't Defs.' Mem."), Ex. 1). These documents are integral to the complaint, and the plaintiff does not contest their authenticity. Accordingly, the court will consider these documents and disregard all other materials submitted by the defendants in evaluating their motions to dismiss.

prepare any document to inform Col. Andrew of his opinions regarding the Unit. (Am. Compl. ¶ 12.)

The letter addressed a number of perceived shortcomings of the Aviation Unit. Portions criticized the Unit's supervisors. For example, Miller asserted, "The Squad assignment and work schedule 95s show the inability of Supervisors to supervise," and he complained that supervisors lacked knowledge of police aviation. (Miller Letter at 5–6.) Much of the Miller Letter, however, may reasonably be read as relating to safety and the abuse of public resources. Miller expressed concern that one member of the Aviation Unit had insufficient experience in the maintenance of helicopters, and he indicated he believed the training of pilots and observers was inadequate. (*Id.* at 1–4.) The letter also included a complaint about a "dog and pony" show in which a helicopter was flown to Baltimore County, referring to a landing at the school attended by Sgt. Poffenbarger's children. (*Id.* at 7; Am. Compl. ¶ 10.) Such misuse of BPD helicopters subsequently garnered media attention. (Am. Compl. ¶ 11.)

Although Miller intended to deliver the letter to Col. Andrew, it was somehow obtained by Sgt. Poffenbarger, who was in charge of the Aviation Unit while its commander, Lt. Crenshaw, was on military leave. (*Id.* at ¶ 10, 13.) Sgt. Poffenbarger reacted by criticizing Miller's performance and attempting to ostracize him from the Unit. In a July 2006 performance report, Sgt. Poffenbarger accused Miller of circulating a document, the letter to Col. Andrew, "which was filled with 'slander of the unit and all of it's [sic] supervision.'" He sent Miller anonymous notes threatening that if Miller did not admit to department violations that he had not committed, he would be subject to discipline. Finally, Sgt. Poffenbarger filed internal charges alleging that Miller made false statements on the basis of statements in the letter to Col. Andrew. (*Id.* at ¶¶ 13–14.)

Lt. Crenshaw returned from military leave in late 2006, and, on February 2, 2007, Lt. Crenshaw removed Miller from the Aviation Unit on the basis of an evaluation that allegedly contains "numerous false statements and personal attacks."  Miller was then transferred to the Marine Unit, which provides uniformed foot patrol in the Inner Harbor area.  He had not previously held this position or received recent training as a uniform foot patrol officer. Moreover, he was advised that this reassignment would result in a decrease in pay.  (*Id.* at ¶¶ 15–16.)  At that time, Miller alleges, Former Commissioner Hamm maintained a custom or practice of retaliating against those who spoke out on matters of public concern.  (*Id.* at ¶ 27.)

Miller protested his reassignment through representatives of the Fraternal Order of Police ("FOP").  FOP President Paul Blair informed Miller that BPD officials had told him that they would dismiss the charges Sgt. Poffenbarger filed and remove them from Miller's personnel file if Miller resigned.  Relying on these statements and his dissatisfaction with the reassignment to a lower-paying position in which he did not fly helicopters, Miller resigned.  (*Id.* at ¶¶ 17–18.) Despite these alleged representations to FOP President Blair, Miller's personnel file continues to contain false charges, including charges that he made false statements. This file is likely to be inspected by prospective employers because, in order to comply with Maryland regulations, the BPD maintains a practice of providing all records relating to a former officer to prospective law enforcement employers.  (*Id.* at ¶¶ 20, 38.)  In addition, on May 1, 2007, Lt. Edward Schmitt of the BPD sent a "Notice of Personnel Action" to the Maryland Police and Correctional Training Commissions, and this Notice indicated that Miller resigned while under administrative charge or investigation.  (*Id.* at ¶ 19; BPD Defs.' Mem. Ex. 5; Law Dep't Defs.' Mem., Ex. 1.)

In order to have these items removed from his personnel file, Miller sent a letter requesting a name-clearing hearing to Patrick Sheridan, a lawyer in the Office of Legal Affairs.

The Office of Legal Affairs is an office within BPD staffed by the Baltimore City Law Department that provides legal advice to the BPD and represents the BPD in disputes. Miller alleges Sheridan and his supervisor, Karen Stakem-Hornig, chose to ignore the request without conveying it to the BPD. City Solicitor Nilson was aware that Stakem-Hornig was failing to convey this and other matters to the BPD, that Miller had requested a name-clearing hearing, and that Stakem-Hornig had ignored this request. In the alternative, Miller claims Stakem-Hornig conveyed the request to an unidentified BPD officer or officers, and this John/Jane Doe(s) denied the request pursuant to policies maintained by the BPD and Former Commissioner Hamm. Miller asserts, as a result of this policy, as well as Former Commissioner Hamm's practice of retaliating against those who speak on matters on public concern, the BPD has faced and been forced to settle numerous other lawsuits. (*Id.* at ¶¶ 21–27.)

The Amended Complaint alleges claims falling into three general categories:

1. Claims against the BPD defendants arising from Miller's reassignment and resignation;[5]

2. Claims against both the BPD defendants and the Law Department defendants alleging a violation of Miller's due process rights resulting from the denial of his request for a name-clearing hearing;[6] and

3. A claim of supervisory liability against City Solicitor Nilson and Stakem-Hornig.

## STANDARD OF REVIEW

---

[5] This includes the following: (1) First Amendment Retaliation in violation of 42 U.S.C. § 1983 (Count I); (2) First Amendment Retaliation in violation of Md. Const., Declaration of Rights, Arts. 24 & 40 (Count II); (3) Procedural Due Process Violation (Property Interest) in violation of 42 U.S.C. § 1983 (Count III); (4) Procedural Due Process Violation (Property Interest) in violation of Md. Const., Declaration of Rights, Art. 24 (Count IV); (5) Abusive Discharge (Count VIII).

[6] Specifically, Miller alleges that he was deprived of a liberty interest without due process in violation of 42 U.S.C. § 1983 (Count V) and Md. Const., Declaration of Rights, Art. 24 (Count VI). Miller labels these claims as substantive due process violations. This type of claim, however, properly invokes procedural due process protections. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569, 92 S. Ct. 2701 (1972). All parties analyze these Counts as claims of procedural due process violations, and the court will do the same. Miller has sued John/Jane Doe(s) for this category of claim only.

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) (internal citations and alterations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering "more than labels and conclusions." *Id.* (internal quotation marks and alterations omitted). It is not sufficient that the well-pleaded facts create "the mere possibility of misconduct." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1950 (2009). Rather, to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning the court could draw "the reasonable inference that the defendant is liable for the conduct alleged." *Id.* at 1949 (internal quotations and citation omitted).

ANALYSIS

I. *First Amendment Retaliation*

To state a claim for First Amendment retaliation under 42 U.S.C. § 1983, a public employee must establish three elements.[7]  First, the plaintiff must have engaged in speech that was of a type that triggered First Amendment protection.  As to the first element, two inquiries "guide interpretation of the constitutional protections accorded to public employee speech":  (i) "whether the employee spoke as a citizen on a matter of public concern," which is a threshold inquiry, and (ii) "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951 (2006) (citations omitted).  Second, "the employee must establish retaliation of some kind."  *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000).  Finally, there must be "a causal relationship between the protected expression and the retaliation."  *Id.*

Miller argues his letter to Col. Andrew constitutes protected speech and he was reassigned in reaction to that speech.  This, he alleges, constitutes retaliation in violation of 42 U.S.C. § 1983 and the Maryland Declaration of Rights.[8]  In response, the BPD defendants contend the plaintiff's speech is not entitled to First Amendment protection.  They further argue the reassignment does not constitution retaliation, and, if it does constitute retaliatory action, Miller did not adequately plead the requisite causal connection.  I conclude that Miller plausibly has alleged he spoke as a citizen on a matter of public concern, was subject to retaliation, and his

---

[7] Courts have formulated this inquiry in different manners; the content of the analysis, however, remains largely consistent.  *See Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 351–52 (4th Cir. 2000) (outlining four elements a public employee must establish to state a claim); *Edwards*, 178 F.3d at 246 (stating that the court must undertake a three-part analysis).

[8] The Maryland Court of Appeals has "often commented that . . . state constitutional provisions are *in pari materia* with their federal counterparts."  *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 805 A.2d 1061, 1071 (2002).  Although this memorandum primarily discusses Miller's claims pursuant to 42 U.S.C. § 1983, the same analysis applies to the corresponding state constitutional claims unless otherwise noted.

speech was causally related to the retaliation. Accordingly, the motion to dismiss these claims will be denied.

A. <u>Speaking as a Citizen upon a Matter of Public Concern</u>

A federal court should review an employment action taken in response to a public employee's speech only if the employee was speaking "as a citizen upon matters of public concern," rather than "as an employee upon matters only of personal interest." *Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684 (1983). The BPD defendants argue Miller wrote his letter as an employee, not a citizen, and it dealt with personal grievances only, so it is not entitled to First Amendment protection.

To state a claim, a public employee must allege he spoke as a citizen, not "pursuant to his or her official responsibilities." *Garcetti*, 547 U.S. at 424. In determining whether speech was made pursuant to an employee's official duties, it is *not* dispositive, however, that the speech occurred in the workplace or that the subject matter of the "expression[] related to the speaker's job." *Id.* at 420–21. Applying this rule in *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009), the Fourth Circuit concluded dismissal was not warranted where the plaintiff "was not under a duty to write the memorandum" that prompted his firing, "had not previously written similar memoranda," and "would not have been derelict in his duties . . . had he not written the memorandum." *Id.* at 264. The facts in the present case strongly resemble those in *Andrew*. Here, Miller has alleged he was not obligated to write the letter to Col. Andrew and would not have suffered any adverse employment consequences for failure to write the letter. He had not previously produced any similar document; indeed, he did not write *any* other memoranda during his employment with BPD. (Am. Compl. ¶ 12.) Consequently, dismissal on these grounds would be inappropriate.

In addition, "'to trigger First Amendment protection, the speech at issue must relate to matters of public interest.'" *Goldstein*, 218 F.3d at 352 (quoting *Hanton v. Gilbert,* 36 F.3d 4, 6 (4th Cir. 1994)). The Fourth Circuit has "explained that the answer to the public concern inquiry rests on 'whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee.'" *Edwards*, 178 F.3d at 247 (quoting *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir. 1985)). In performing this inquiry, a court must consider "the content, context, and form" of the speech. *Id.*

"Matters relating to public safety are quintessential matters of 'public concern.'" *Goldstein*, 218 F.3d at 353. In contrast, "'[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest' . . . are not matters of public concern." *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004) (quoting *Stroman v. Colleton County Sch. Dist.,* 981 F.2d 152, 156 (4th Cir. 1992)). Significantly, in evaluating whether an employee's speech involves a matter of public concern, the speech must be considered "as a single expression . . . in its entirety," rather than be divided into discrete components. *Stroman*, 981 F.2d at 157. Therefore, even if speech primarily involves personal grievances or other matters of personal interest, so long as it addresses some matter of public concern, it will satisfy the threshold inquiry. *See Campbell v. Galloway*, 483 F.3d 258, 268 (4th Cir. 2007) ("[The plaintiff's] letter cannot be deemed to be a matter of private concern simply because the bulk of the letter addresses what can only be viewed as personal grievances."). If the matter of public concern discussed plays only a minor role in the expression relative to matters of personal interest, this should be taken into account in balancing the employee's interests against those of the employer. *See Connick*, 461 U.S. at 151–52 (cautioning "that a stronger showing" of the

In addition, "'to trigger First Amendment protection, the speech at issue must relate to matters of public interest.'" *Goldstein*, 218 F.3d at 352 (quoting *Hanton v. Gilbert,* 36 F.3d 4, 6 (4th Cir. 1994)). The Fourth Circuit has "explained that the answer to the public concern inquiry rests on 'whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee.'" *Edwards*, 178 F.3d at 247 (quoting *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir. 1985)). In performing this inquiry, a court must consider "the content, context, and form" of the speech. *Id.*

"Matters relating to public safety are quintessential matters of 'public concern.'" *Goldstein*, 218 F.3d at 353. In contrast, "'[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest' . . . are not matters of public concern." *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004) (quoting *Stroman v. Colleton County Sch. Dist.,* 981 F.2d 152, 156 (4th Cir. 1992)). Significantly, in evaluating whether an employee's speech involves a matter of public concern, the speech must be considered "as a single expression . . . in its entirety," rather than be divided into discrete components. *Stroman*, 981 F.2d at 157. Therefore, even if speech primarily involves personal grievances or other matters of personal interest, so long as it addresses some matter of public concern, it will satisfy the threshold inquiry. *See Campbell v. Galloway*, 483 F.3d 258, 268 (4th Cir. 2007) ("[The plaintiff's] letter cannot be deemed to be a matter of private concern simply because the bulk of the letter addresses what can only be viewed as personal grievances."). If the matter of public concern discussed plays only a minor role in the expression relative to matters of personal interest, this should be taken into account in balancing the employee's interests against those of the employer. *See Connick*, 461 U.S. at 151–52 (cautioning "that a stronger showing" of the

government's interest as an employer "may be necessary if the employee's speech more substantially involved matters of public concern"); *Stroman*, 981 F.2d at 158. Although the BPD defendants seek to portray Miller's letter as overwhelmingly concerned with personal grievances, such as his complaints about the Aviation Unit's supervision, the content of the letter involves at least some matters of public concern, when read in the light most favorable to Miller. Specifically, it discusses matters of public safety, such as the inadequate training of observers, and it discusses the public fisc, including the misuse of BPD helicopters.

The form of the speech does not alter the conclusion that Miller spoke on a matter of public concern. It is "irrelevant" that the speech occurred in the workplace: "'An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace.'" *Hoffman v. Balt. Police Dep't*, 379 F. Supp. 2d 778, 794 (D. Md. 2005) (quoting *Urofsky v. Gilmore,* 216 F.3d 401, 406–07 (4th Cir. 2000)). Moreover, the fact that an employee does "not make his views publicly known does not, in any way, undermine the public concern encompassed in his speech." *Goldstein*, 218 F.3d at 354. That Miller's letter was directed within the BPD and intended to be communicated privately to Col. Andrew, therefore, does not detract from its status as a matter of public concern. In addition, this court rejects the defendants' argument that Miller could not be speaking as a citizen on a matter of public concern because his letter used technical language. To accept the argument would suggest that speech by people who have the greatest degree of knowledge about a subject should receive the least amount of protection. This conclusion would be at odds with the Supreme Court's acknowledgement of "the importance of promoting the public's interest in receiving the well-informed views of government employees." *Garcetti*, 547 U.S. at 419; *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 572, 88 S. Ct. 1731 (1968) (recognizing "it is essential" that teachers be

permitted to speak on the issue of school funding without fear of retaliation because they are "the members of a community most likely to have informed and definite opinions" on this issue). The plaintiff's allegations, as well as this court's reading of the Miller letter, supports the inference that members of the community would be interested in Miller's informed opinions on the training of members of the Aviation Unit and misuse of its resources, regardless of any use of technical terminology.

The context of the speech also supports a finding that it addressed a matter of public concern. Miller alleges media outlets have reported "news stories about similar claims made by [him,]" and another incident involving the misuse of BPD helicopters garnered significant publicity. (Am. Compl. ¶ 11.) Media coverage of the matters discussed in Miller's letter indicates they were of interest to members of the public. *See City of San Diego v. Roe*, 543 U.S. 77, 83–84, 125 S. Ct. 521 (2004) ("[P]ublic concern is something that is a subject of legitimate news interest.") Miller has plausibly alleged he was speaking as a citizen on a matter of public concern in the letter to Col. Andrew.

B. Retaliation

The BPD defendants further contend Miller has not sufficiently alleged that he was subject to retaliation because his reassignment was a lateral move, not a demotion, so it did not deprive him of a valuable government benefit. The proper standard for determining whether a retaliatory action occurred for the purposes of a public employee's First Amendment claim is whether the plaintiff was "deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill his exercise of First Amendment rights," *Goldstein*, 218 F.3d at 352; the action need not be "the substantial equivalent of a dismissal."

*DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir. 1995) (citing *Rutan v. Republican Party of Ill.,*
497 U.S. 62, 75–76, 110 S. Ct. 2729 (1990)).

Here, Miller has alleged he was reassigned from the Aviation Unit to the Marine Unit,
where he would no longer fly helicopters. As a person experienced in flying helicopters for law
enforcement, Miller possessed a highly specialized and desirable skill set, and his reassignment
would result in the atrophy of these skills. Moreover, Miller has alleged that he was informed
the reassignment would be accompanied by a significant decrease in salary. Because Miller
claims his reassignment would involve a substantial and adverse change in duties and pay, he has
adequately alleged "retaliatory conduct . . . sufficient 'to deter a person of ordinary firmness'
from exercising his First Amendment rights." *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir.
2000) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)); *see also Love-Lane*, 355 F.3d
at 779 ("[The plaintiff's] transfer or reassignment, which was a demotion in duties and
responsibilities, qualifies as an adverse employment action for purposes of her free speech
claim."). A reasonable person who had expended the time and resources to learn to fly
helicopters and who was recruited as a Flight Officer based on his training and experience would
likely be deterred from exercising his right to speak if that speech would result in transfer to a
position that involved no flying and a lower salary.

C. Causation

In order to demonstrate causation for a First Amendment retaliation claim, the plaintiff
must plead facts showing "that the protected speech was a substantial factor in the decision to
take the allegedly retaliatory action." *Goldstein*, 218 F.3d at 352 (internal quotation marks and
citations omitted). Accepting all of his allegations as true and drawing all reasonable inferences
in his favor, Miller has set forth sufficient facts to make it plausible that his protected expression

was a substantial factor in his reassignment.  He alleged that Sgt. Poffenbarger, within a month of discovering the letter, issued a performance review criticizing him for the letter's contents. Sgt. Poffenbarger then engaged in a harassment campaign against him, including sending anonymous threatening notes and filing administrative charges against him, based on the letter. Miller further alleges that he was transferred from the unit within two months of the return of Lt. Crenshaw, who, unlike Sgt. Poffenbarger, had the authority to reassign Miller.  The reassignment, Miller claims, was based on an evaluation containing false statements about Miller's helicopter flying skills and his integrity.  Prior to the letter, supervisors had consistently praised Miller's performance.  The change in Miller's performance evaluations after the letter, as well as the allegations that Sgt. Poffenbarger engaged in an ongoing pattern of conduct expressly attacking Miller for writing the letter over a six-month period leading up to the reassignment, is sufficient to raise a plausible inference that the protected expression in the letter was a substantial factor motivating the alleged retaliatory action.

On the facts pled by Miller, it is plausible that he engaged in protected speech, was subject to a retaliatory action, and this action was causally related to his protected speech. Accordingly, the BPD defendants' motion to dismiss these Counts will be denied.

II. *Due Process Claims*

Miller asserts two distinct violations of his due process rights under the U.S. and Maryland Constitutions.  First, he claims he was deprived of a property interest without due process because he was constructively discharged from his employment without receiving a hearing.  Second, he contends he was deprived of a liberty interest in his reputation without the name-clearing hearing to which he was entitled.

A. Property-Interest Claims

In order to state a due process claim, a plaintiff must show two elements: (1) "that he has a constitutionally protected 'liberty' or 'property' interest," and (2) "that he has been 'deprived' of that protected interest by some form of 'state action.'" *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988) (citations omitted). "In order to have a protected property interest in his employment, a person must possess a legitimate claim of entitlement to it—created, for example, by contract or state law." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308 n.14 (4th Cir. 2006). In this case, Miller has a property interest in his employment with the BPD created by the Public Local Laws of Baltimore City, which dictate that he cannot be dismissed or removed without reasonable notice and an opportunity to be heard.[9] Md. Pub. Local Laws Art. 4 § 16-11. In order to survive the BPD defendants' motion to dismiss, Miller must allege sufficient facts to show that he was deprived of this interest by state action.

Where, as in this case, the plaintiff-employee resigned and was not discharged, the court must determine whether this resignation was voluntary. "If [the employee] resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily" and was not deprived of it by the state. *Stone*, 855 F.2d at 173. Only if his resignation "was so involuntary that it amounted to a constructive discharge," should it "be considered a deprivation by state action triggering the protections of the due process clause." *Id.* In *Stone*, the Fourth Circuit identified two circumstances in which "resignations have been found involuntary, hence . . . 'deprivations' of property. . . : (1) where obtained by the

---

[9] The BPD defendants argue, without elaboration, that Miller cannot have a property interest pursuant to the Public Local Laws of Baltimore City because they are preempted by the Law Enforcement Officer's Bill of Rights (LEOBR). The LEOBR, however, does not preempt the Public Local Laws of Baltimore City to the extent they are consistent because both were enacted by the General Assembly. *See Police Comm'r v. Dowling*, 281 Md. 412, 379 A.2d 1007, 1010 (1977) (finding that an argument that the Public Local Laws were preempted by the LEOBR is "without merit" because it "overlooks [the fact] . . . that the statutes here . . . were both passed by the General Assembly"). The defendants have not presented and this court has not located any portion of the LEOBR that conflicts with section 16-11 of the Public Local Laws. This issue need not be reached, however, because Miller has failed to establish the second element of the claim, deprivation by state action.

employer's misrepresentation or deception, and (2) where forced by the employer's duress or coercion." *Id.* at 174 (citations omitted). Miller argues his resignation should be found involuntary under either theory.

"Under the 'misrepresentation' theory, a resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation." *Id.* (citing *Scharf v. Dep't of the Air Force,* 710 F.2d 1572, 1575 (Fed. Cir. 1983)). A misrepresentation that concerns the consequences of or alternatives to resignation is considered material. *Id.* (citations omitted). Miller alleges that the BPD defendants misrepresented to him the consequences of resignation because he was advised by FOP President Paul Blair that BPD officials stated they would remove the charges filed by Sgt. Poffenbarger from Miller's personnel file if he resigned. A "critical element" of this theory, however, is that the plaintiff "*reasonably* relied to his detriment on the asserted misrepresentation." *Id.* at 176 (emphasis added). It is not plausible, under the facts alleged, that Miller's reliance on this statement was reasonable. Miller never attempted to confirm that his resignation would have the promised effect. In fact, it appears he never ascertained, either prior to deciding to resign or before his resignation became effective, the identity of the official or officials who made the statement. Under these circumstances, any reliance on the alleged statement was unreasonable. *Cf. Zepp v. Rehrmann*, 79 F.3d 381, 386–87 (4th Cir. 1996) (stating that if a misrepresentation was made, the plaintiff could not have reasonably relied upon it because he "could easily have ascertained his legal rights before formally tendering his resignation or before it became effective . . . . Yet, over the following months, Zepp never wavered from his decision to resign or sought to invoke the hearing process that was available for involuntary terminations.").

When evaluating an employee's claim that his resignation was involuntary as a result of duress or coercion, a court must examine the "totality of the circumstances" to determine whether "the employer's conduct in requesting resignation effectively deprived the employee of free choice in the matter." *Stone*, 855 F.2d at 174. It is not enough that the employee was forced to choose between "comparably unpleasant alternatives." *Id.* If the employee is given a choice, even an undesirable one, his resignation is not involuntary. This is an objective inquiry, so it is irrelevant that the employee subjectively believed he had no option but to resign. *Id.* In determining whether an employee's decision to resign resulted from duress or coercion, the Fourth Circuit has instructed courts to consider "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation." *Id.*

In the present case, these factors demonstrate it is not plausible Miller's resignation was involuntary. He had alternatives to resignation. He could accept the position with the Marine Unit. In addition, as he believed that he had been reassigned because of the exercise of his First Amendment rights, he was authorized by the Law Enforcement Officers' Bill of Rights ("LEOBR"), Md. Code Ann., Pub. Safety §§ 3-101 *et. seq.*, to apply to the Circuit Court for Baltimore City for an order directing the BPD to show cause why his right not to be reassigned on this basis should not be granted. *See* Pub. Safety § 3-103(d), -105(a). Moreover, Miller understood the nature of this choice. He was an experienced member of law enforcement who sought and obtained the assistance of union representatives after his reassignment. He was under no pressure to resign immediately, and he chose the date of his resignation. Prior to this, he had ample opportunity to consult with counsel, so to the extent he did not know his rights, he had

time and resources to become familiar with them.  Undoubtedly, Miller faced a difficult and undesirable choice, but his resignation was the result of a choice and, hence, not involuntary.

Under the facts alleged, Miller's resignation was voluntary; thus, he was not deprived of a property interest.  The BPD defendants' motion to dismiss these claims will be granted.

B.  Liberty-Interest Claims

Miller alleges that he was deprived of a liberty interest without due process by the Law Department and/or the BPD's refusal to grant him a name-clearing hearing while the BPD was publicizing allegedly false and stigmatizing information about him to other employers.  A combination of two Fourteenth Amendment rights gives rise to a public employee's liberty-interest claim:  "(1) the liberty to engage in any of the common occupations of life; and (2) the right to due process [w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him."  *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (internal quotation marks and citations omitted) (alteration in original).  This claim protects an employee's "'freedom to take advantage of other employment opportunities'" by preventing a public employer from disseminating false reasons for the employee's discharge without providing the employee notice and opportunity to be heard in order to clear his name.  *See id.* at 645–46 & n.1 (quoting *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 573, 92 S. Ct. 2701 (1972)).  It is undisputed that Miller was not granted a name-clearing hearing,[10] so these counts should not be dismissed if he has pled facts showing that the government has made statements requiring such process.  To state a liberty-interest claim, an

---

[10] The Law Department defendants make the odd argument that the plaintiff was not entitled to a name-clearing hearing because he directed his request for such a hearing to the Office of Legal Affairs rather than the BPD.  This court rejects the notion that legal counsel for an organization may simply ignore requests for constitutionally required process directed to their client through them, particularly where, as here, the lawyers involved are located within the client organization and the plaintiff has alleged that such matters are generally handled through the lawyer's office.

employee must allege that the employer's statements (1) charged a serious character defect, thereby placing a stigma on the employee's reputation; (2) accompanied a sufficiently significant change in the plaintiff's employment status; (3) were made public; and (4) were false. *Id.* at 646; *Ridpath*, 447 F.3d at 308. As Miller has alleged facts supporting each of these elements, the defendants' motions to dismiss will be denied as to these claims.

First, in order to give rise to a protected liberty interest, the employer's statements must "impl[y] the existence of serious character defects such as dishonesty or immorality," not merely "allege incompetence." *Ridpath*, 447 F.3d at 308–09 (internal quotation marks and citations omitted); *see also Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982). This is because "by marking him as one who lost his job because of dishonesty or other job-related moral turpitude," the state has made him "all but unemployable" in his chosen occupation. *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984). In this case, Miller claims the BPD made statements that implied more than mere incompetence. Specifically, he asserts his personnel file contained charges that he made false statements.[11] These charges allege dishonesty and, as a result, they may give rise to a protected liberty interest.

Second, the Fourth Circuit has "required that, in order to deprive an employee of a liberty interest, a public employer's stigmatizing remarks must be 'made in the course of a discharge or significant demotion.'" *Ridpath*, 447 F.3d at 309 (quoting *Stone,* 855 F.2d at 172 n.5). "[A] 'significant demotion' may include the reassignment of an employee to a position outside his field of choice." *Id.* In evaluating "the gravity of [a] change in assignment," a court may

---

[11] Miller alleges the BPD publicized false statements about him by placing false charges in his personnel file and by transmitting a Notice of Personnel Action that stated he resigned while under administrative charge or investigation. (*See* Am. Compl. ¶¶ 19, 38; BPD Defs.' Mem., Ex. 5; Law Dep't Defs.' Mem., Ex. 1.) Because I conclude the statement contained in the Notice of Personnel Action fails to meet the requirement that the statement be false, *see infra*, I need not determine whether it satisfies the other requirements. For these requirements, I will consider only the personnel file.

consider the surrounding circumstances; for example, a reassignment involving threats to the employee's career has a greater likelihood of being "significant." *Jackson v. Clark*, 564 F. Supp. 2d 483, 491 (D. Md. 2008) (emphasis omitted). The facts of *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, are instructive in determining whether an employee's reassignment constitutes a significant demotion. In that case, the plaintiff was employed as an administrator in a university's athletics department. Following an NCAA investigation, he was reassigned as the university's Director of Judicial Programs, a transfer which was falsely described as corrective action taken in response to NCAA rules violations. *Id.* at 301. Although he received a greater salary in the new position, *id.*, the Fourth Circuit nevertheless concluded the transfer constituted a "significant demotion" because the plaintiff was assigned "to a position for which he lacked the necessary education and training" and was "completely excluded from his chosen field of intercollegiate athletics administration," *id.* at 310–11.

This court has little difficulty concluding Miller has sufficiently alleged a significant demotion. His reassignment to the Marine Unit excluded him from his chosen career—flying helicopters for law enforcement—a career for which he had considerable training and experience. He was assigned instead to a foot patrol position for which he had no current training. Furthermore, the reassignment occurred only after an alleged months-long harassment campaign by Sgt. Poffenbarger aimed to ostracize Miller from the Aviation Unit. In light of these circumstances, it is plausible the reassignment constituted a significant demotion.

The third requirement is that the employer's statements were made public. To satisfy this requirement, "an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the file."

*Sciolino*, 480 F.3d at 650.  The Fourth Circuit has identified two ways a plaintiff can meet this burden:

> First, the employee could allege . . . that his former employer has a practice of releasing personnel files to all inquiring employers. Second, the employee could allege that although his former employer releases personnel files only to certain inquiring employers, that he intends to apply to at least one of these employers.

*Id.*  Here, Miller has alleged the BPD has a policy or practice of providing copies of all personnel files and other documents relating to an employee to prospective law enforcement employers, and he has already applied for a position with at least one law enforcement agency.  Therefore, Miller's complaint satisfies this element.

Finally, an employee bringing a liberty-interest claim must allege that the employer's statements were false.  *See Ridpath*, 447 F.3d at 312 ("There can be no deprivation of liberty unless the stigmatizing charges at issue are false.").  Miller claims the defendants made stigmatizing charges against him in two ways.  First, upon Miller's resignation, the BPD transmitted a Notice of Personnel Action stating he resigned while under administrative charge or investigation.  Miller's allegations, however, demonstrate that this statement was not false.  At the time Miller resigned, the charges commenced by Sgt. Poffenbarger were pending and had not been dismissed.  This court rejects the plaintiff's suggestion that the statement is actionable because it created a "false and defamatory innuendo."  (Am. Compl. ¶ 38.)  Mere innuendo, where the underlying statement is true, is not sufficient to give rise to a constitutional claim.  Miller has also alleged, however, that the defendants placed stigmatizing charges in his personnel file, which is made public to prospective law enforcement employers.  Among the charges in this file is the allegation that Miller made false statements.  Miller claims this charge is false and is based on statements he made in his letter to Col. Andrew.  With this, Miller has

sufficiently alleged that the defendants' statements were false. The Amended Complaint therefore satisfies the requirement that the plaintiff allege the employer publicized false, stigmatizing charges against him in connection with a discharge or significant demotion.

Although Miller has pled sufficient facts to establish the elements of a liberty-interest claim, he has not alleged a plausible claim as to each defendant being sued in his or her individual capacity. Specifically, the allegations in the complaint establish virtually no involvement by City Solicitor Nilson in the events giving rise to this claim. Unlike the other defendants facing suit in their individual capacities, Nilson is not alleged to have participated in Miller's reassignment, the placement of stigmatizing charges in Miller's personnel file, or the denial of Miller's request of a name-clearing hearing. At most, the complaint shows that Nilson knew Stakem-Hornig was acting as a final decisionmaker on some BPD matters, that he was aware Miller had requested a name-clearing hearing, and that he failed to intervene although this request was ignored. Miller does not claim Nilson instructed Stakem-Hornig to deny a name-clearing hearing. Moreover, there is no indication Nilson—who, unlike Stakem-Hornig and Sheridan, was not in the Office of Legal Affairs—knew of Miller's letter to Col. Andrews, of Sgt. Poffenbarger's conduct, or of the content of Miller's personnel file. As Miller has failed to allege sufficient facts regarding City Solicitor Nilson's involvement in the improper denial of the name-clearing hearing, it is not plausible that Nilson will be liable in his individual capacity for depriving Miller of a liberty interest without due process.

Accordingly, the motion to dismiss these Counts will be granted as to the claim against City Solicitor Nilson in his individual capacity; it will be denied as to the other defendants.

III. *Abusive Discharge*

In addition to his constitutional claims, Miller brings a claim of abusive discharge under Maryland common law. To state a claim for abusive or wrongful discharge, a plaintiff must allege "that (1) she was discharged; (2) her discharge violated a clear mandate of public policy; and, (3) there is a nexus between the employee's conduct and the employer's decision to fire the employee." *King v. Marriott Int'l, Inc.*, 160 Md. App. 689, 866 A.2d 895, 901 (Ct. Spec. App. 2005). Where an employee resigns and is not terminated, she generally "is not regarded as having been discharged, and thus would have no right of action for abusive discharge." *Beye v. Bureau of Nat'l Affairs*, 59 Md. App. 642, 477 A.2d 1197, 1201 (Ct. Spec. App. 1983). Maryland law, however, "recognizes the concept of 'constructive discharge,'" so it will "overlook the fact that a termination was formally effected by a resignation if the record shows that the resignation was indeed an involuntary one, coerced by the employer." *Id.* Like the federal courts in the context of a due process claim for deprivation of a property interest, Maryland applies an objective standard in determining whether a resignation was involuntary due to coercion. *Id.* at 1202. A resignation will be found to be involuntary only if "the employer has deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign." *Id.* at 1203. As discussed above with respect the plaintiff's property-interest claim, Miller's resignation was not involuntary under an objective standard. Miller faced a difficult choice, but he was given a reasonable time, during which he could have consulted with counsel, in which to make the choice. *Cf. Bd. of Trustees of the State Univs. & Colls. v. Fineran*, 75 Md. App. 289, 541 A.2d 170, 179 (Ct. Sec. App. 1988) (holding that the plaintiff's resignation did not constitute a constructive discharge, even though he had been told he would be terminated if he did not resign, where the plaintiff "was offered the opportunity to resign and receive . . . [the] benefits of

a resignation as opposed to a termination," and "[h]e obviously weighed his options, with the advice of counsel").

Miller contends that Maryland also recognizes a constructive discharge where an employee has been hired to perform specialized duties and subsequently is reassigned to a different position. In making this argument, he relies on *Weisman v. Connors*, 69 Md. App. 732, 519 A.2d 795 (Ct. Spec. App. 1987), *rev'd on other grounds* 312 Md. 428, 540 A.2d 783 (Md. 1988), in which the Maryland Court of Special Appeals stated, "'[W]hen an employee contracts to fill a particular position any material change in duties or significant reduction in rank will constitute a constructive discharge which, if unjustified, is a breach of contract.'" (Pl.'s Opp'n at 24 (quoting *Weisman*, 519 A.2d at 800 (emphasis omitted)).) There is a critical distinction between *Weisman* and the present case, however. *Weisman* involved a contractual employee who brought suit for breach of contract after he was forced to a fill a position below that which he had contracted to perform. *See Weisman*, 519 A.2d at 797–99, 800–01. Here, in contrast, although Miller may have accepted a position with the BPD on the understanding that he would fly helicopters, he did not formalize this understanding in a contractual agreement, and he is suing for abusive discharge rather than breach of contract. The *Weisman* court took care to distinguish the conduct necessary to establish constructive discharge for a breach of contract claim from that required for an abusive discharge claim, observing that, in order to prove constructive discharge of a contractual employee for breach of contract, the law did *not* require "some 'truly outrageous conduct' on the part of the employer approximating that needed to constitute an 'abusive discharge.'" *Id.* at 800. Miller has failed to allege sufficiently outrageous conduct that would render his decision to resign involuntary, and the abusive discharge claim therefore will be dismissed.

## IV. *Supervisory Liability*

Miller claims Stakem-Hornig and City Solicitor Nilson are liable for his constitutional injuries in their capacities as supervisors. In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Fourth Circuit set forth three elements required to establish supervisory liability under 42 U.S.C § 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799 (citations omitted). To satisfy the first element, a plaintiff must show the supervisor had knowledge of a subordinate's conduct that "pose[d] a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Id.* (citing *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir. 1984)). This requires that the plaintiff allege conduct that "is widespread, or at least has been used on several different occasions," and "poses an unreasonable risk of harm of constitutional injury." *Id.* (citing *Slakan*, 737 F.2d at 373–74).

Although Miller brings this claim against both Stakem-Hornig and City Solicitor Nilson, the relevant pleadings focus only on Nilson's knowledge of his subordinate's conduct. (*See* Am. Compl. ¶¶ 24–25, 43–44.) To the extent that the pleadings support Stakem-Hornig's liability, it is not as a supervisor, but as an active participant in the decision to deny Miller a name-clearing hearing. As a result, the motion to dismiss the claim of supervisory liability will be granted as to Stakem-Hornig. With respect to Nilson, the pleadings do not give rise to a plausible inference that he had actual or constructive knowledge that his subordinate, Stakem-Hornig, was engaging in conduct that posed a pervasive and unreasonable risk of constitutional injury to the plaintiff.

The complaint alleges only that Nilson had reason to believe Stakem-Hornig was violating the constitutional rights of BPD officers and that he had knowledge she was acting as a final decisionmaker rather than referring decisions to the BPD.[12] (Am. Compl. ¶ 24, 44.) The former allegation is too broad and vague to give rise to supervisory liability. The latter allegation, while suggesting potentially improper conduct, does not make it plausible that Nilson was aware Stakem-Hornig was engaging in conduct posing an unreasonable risk to Miller's rights. Miller does not specify the types of decisions Stakem-Hornig was failing to refer to BPD, and he does not assert these decisions repeatedly implicated officers' constitutional rights. Miller has not established the first element of supervisory liability as to either Stakem-Hornig or City Solicitor Nilson. Accordingly, this claim will be dismissed.

V. _Timeliness as to John/Jane Doe and Sheridan_

Miller did not assert a cause of action against John/Jane Doe or Sheridan in his original complaint. In his amended complaint, he asserts due process claims against these defendants arising from the BPD's refusal to grant his request for a name-clearing hearing. The defendants contend that these claims, which were filed on June 12, 2010, are untimely. All parties agree that the applicable statute of limitations is three years. _See_ Md. Code Ann., Cts. & Jud. Proc. § 5-101; _Owens v. Okure_, 488 U.S. 235, 249–50, 109 S. Ct. 573 (1989). They dispute, however, the time at which the plaintiff's cause of action accrued so as to trigger the running of the statute of limitations. The defendants argue the statute began to run, at the latest, on June 3, 2007, the date on which Miller resigned. Miller counters that his cause of action against John/Jane Doe and Sheridan did not accrue until he was denied, or at minimum had requested, a name-clearing hearing. Although the precise date of his request is not specified, Miller proffers that it occurred

---

[12] The complaint also alleges that Nilson knew plaintiff made a name-clearing request and that Stakem-Hornig ignored it. (Am. Compl. ¶ 25.) This could not be characterized as pervasive conduct by Stakem-Hornig, so, if proven, it would not support Nilson's supervisory liability.

less than three years before he filed the Amended Complaint, so the limitations period had not yet expired. I believe Miller has the better position.

"[F]or purposes of a § 1983 claim, a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice—e.g., by the knowledge of the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Nasim v. Warden*, *Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995). It is, therefore, essential to understand that, as to a liberty-interest claim, "the constitutional harm 'is not the defamation' itself; rather it is 'the denial of a hearing at which the dismissed employee has an opportunity to refute the public charge.'" *Sciolino*, 480 F.3d at 649 (quoting *Cox v. N. Va. Transp. Comm'n,* 551 F.2d 555, 558 (4th Cir. 1976)). Miller could not have had knowledge of his injury—the denial of due process—at the time he resigned. At that point, it remained possible that the BPD would grant a request for a name-clearing hearing. If this had occurred, he would have sustained no injury giving rise to a cause of action. The Sixth Circuit, considering the same argument in *Kelly v. Burks*, 415 F.3d 558 (6th Cir. 2005), reached the same conclusion: the statute of limitations did not begin to run until the name-clearing hearing was denied because "[o]nly as of that date did [the plaintiff] 'know or have reason to know of the injury which is the basis of his action.'" *Id.* at 562 (quoting *Sevier v. Turner,* 742 F.2d 262, 273 (6th Cir. 1984)) (original alterations omitted). This court holds that, assuming a request for a name-clearing hearing was made without unreasonable delay, the statute of limitations began to run when the request for the hearing was not granted. The claims first asserted in the amended complaint are therefore timely.[13]

---

[13] The defendants express concern that this would lead to the absurd result that an employee could toll the statute of limitations indefinitely by failing to request a name-clearing hearing. Although I do not reach this issue because Miller submitted such a request promptly, I note that an employee who did not receive a name-clearing hearing within a reasonable period, whether or not she requested one, and who had reason to know her employer had made

VI. *Official-Capacity Claims*

In addition to suing certain defendants in their individual capacities, Miller brings suit against all defendants in their official capacities. A suit against a defendant in his official capacity is treated as a suit against the governmental entity for which the defendant is an agent. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358 (1991) (citing *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S. Ct. 3099 (1985)). Consequently, to succeed on such a claim, the plaintiff must satisfy the requirement, established for municipal-liability suits in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978), that "the entity's 'policy or custom' . . . played a part in the violation of federal law." *Graham*, 473 U.S. at 166 (citations omitted). A plaintiff in a § 1983 action, therefore, "must allege a plausible policy or custom . . . that caused the constitutional violation" to state a claim for relief. *Flanagan v. Anne Arundel County*, 593 F. Supp. 2d 803, 809–10 (D. Md. 2009). In this context, the Fourth Circuit has recently reiterated the Supreme Court's observation that "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice' to plead a claim," and a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Walker v. Prince George's County*, 575 F.3d 426, 431 (4th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949–50).

Although Miller purports to identify several policies, customs, and practices engaged in by the BPD defendants that causally contributed to his constitutional violations, these allegations amount to no more than conclusory statements that are not sufficient to establish a plausible claim for relief. Miller contends Former Commissioner Hamm adopted a consistent custom, policy, or practice of retaliating against those who spoke about matters of public concern and that the BPD has been forced to settle claims arising from such incidents of retaliation. In addition,

public, false, stigmatizing charges about her would likely be on inquiry notice of her claim. *See Nasim*, 64 F.3d at 955–56 ("[I]t is now well established that a federal cause of action accrues upon inquiry notice.").

he alleges it was BPD's policy or practice to ignore or otherwise refuse to grant name-clearing hearings, as well as Former Commissioner Hamm's custom, pattern or practice to fail to provide procedural hearings, including name-clearing hearings, to which BPD officers were entitled. These allegations are too generalized to state a claim for municipal or official-capacity liability that is plausible, rather than merely possible. Miller does not describe the circumstances surrounding the alleged other acts of retaliation and denials of name-clearing hearings so as to raise an inference that they were the result of a common policy or practice established by BPD policymakers. Without specific factual allegations, the court need not accept Miller's bald assertions of the existence of policies, practice, and customs. Moreover, though Miller pled with greater specificity that the BPD had a policy or practice of fully disclosing former officers' employment records pursuant to state law, this does not provide a basis for official-capacity liability because this policy alone is unlikely to result in constitutional violations. Miller has failed to allege a plausible BPD policy or custom that caused the alleged violations, so his claims against the BPD defendants in their official capacities must be dismissed.

The amended complaint also fails to provide a basis for official-capacity liability as to the Law Department defendants. Miller does not allege the Law Department or the City of Baltimore, of which the Law Department is an agency, adopted policies and practices with respect to the denial of name-clearing hearings. At most, he implies Stakem-Hornig adopted a practice of failing to refer matters to the BPD and acting as a final decisionmaker on BPD business. This alone, however, is not sufficient to establish official-capacity liability because it does not indicate Stakem-Hornig's independent decisions resulted in repeated deprivations of liberty interests without due process. Miller suggests that the Law Department defendants should be held liable for the BPD's policies. Even had I found the allegations with respect to the

BPD's policies to be sufficient, I would not impute these to the Law Department defendants. To do so would be at odds with the allegations that Stakem-Hornig acted as a final decisionmaker on the plaintiff's request for a name-clearing hearing and failed to refer this request to the BPD. Stakem-Hornig would not have been acting as an independent, final decisionmaker, as Miller claims, if she was merely carrying out BPD policy. No Law Department or Baltimore City policy or custom caused the denial of Miller's name-clearing hearing. Accordingly, the Law Department defendants are not liable in their official capacities.[14]

The claims brought pursuant to § 1983 against the defendants in their official capacities will be dismissed.[15]

CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss will be granted in part and denied in part. A separate Order follows.


January 3, 2011                                    /s/
Date                                               Catherine C. Blake
                                                   United States District Judge

---

[14] The Law Department defendants also contend they cannot be held liable in any event because they merely provided legal advice to the BPD. While they are correct that a lawyer generally may not be held liable for legal advice offered "without malice and in good faith," *Buschi v. Kirven*, 775 F.2d 1240, 1250 (4th Cir. 1985) (citing *Yoggerst v. Stewart,* 623 F.2d 35, 38 (7th Cir. 1980)), this argument misconstrues the plaintiff's claims. Miller does not argue the Law Department defendants are liable as a result of legal advice provided to the BPD. Rather, he contends Stakem-Hornig and Sheridan received the plaintiff's request for a name-clearing hearing and opted to ignore it without referring it to BPD officials.

[15] Maryland does not recognize an official/individual distinction in its constitutional jurisprudence, so this analysis does not affect the plaintiff's claims against defendants Crenshaw, Poffenbarger, John/Jane Doe, Stakem-Hornig, and Sheridan that are based upon violations of Maryland's Declaration of Rights. *See Ritchie v. Donnelly*, 324 Md. 344, 597 A.2d 432, 446 (1991); *see also Franklin v. Clark*, 454 F. Supp. 2d 356, 363 (D. Md. 2006). Commissioner Bealefeld and Former Commissioner Hamm have been sued in their official capacities only, and the amended complaint provides no basis to hold them liable in their individual capacities for the alleged violations. Miller has also failed to state a claim against City Solicitor Nilson in either his official or his individual capacity. Accordingly, the state constitutional claims will be dismissed as to these defendants.